UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

I.G. FARBEN SHAREHOLDERS
ORGANIZATION A/K/A I.G. FARBEN
AKTIONARSVEREINIGUNG E.V. I.L.,

                    Plaintiff,

          -against-

UBS AG; A/K/A/ UNION BANK OF
SWITZERLAND,

                    Defendant.

-------------------------------------------------x

MEMORANDUM AND ORDER
05-CV-4041 (ILG)

GLASSER, United States District Judge:

## **INTRODUCTION**

This action continues a sixty-year legal battle over the distribution of proceeds

from the sale by the U.S. Government ("Government") of a seized corporation, General

Aniline & Film Corporation, ("GAF" or "GAF Assets") allegedly owned by I.G. Farben

("Farben"), a company known to have aided Nazi Germany's World War II effort. This

action is brought by I.G. Farben Shareholders Organization ("Plaintiff" or "FSO"), a

successor in interest to I.G. Farben. FSO is a "legal entity registered and licensed in

Cologne, Germany, which retains the majority of the legal interest in all foreign assets of

the former I.G. Farbenindustrie-in-Liquidation under German law,"[1] including a right to

sue on all of Farben's prospective claims. (Compl. ¶ 17).

Here, Plaintiff sued the Union Bank of Switzerland ("UBS" or "Defendant"),

---

[1] "I.G. Farbenindustrie-in-Liquidation" was a legal entity created specifically for the winding-up
of I.G. Farben. (Compl. ¶ 66).

successor-in-interest to Interhandel[2] for the portion of the proceeds it received from the 1964 auction sale of GAF which had been seized by the Government pursuant to the Trading With the Enemy Act ("TWEA").  In essence, the Complaint asserted that GAF was actually held in trust by Interhandel for Farben's benefit prior to its seizure by the Government, and that the proceeds from the sale therefore should not have gone to Interhandel.

The Complaint sought a declaration, amongst other things,  as to whether the Treaty on the Final Settlement with Respect to Germany, Sep. 12, 1990, 29 I.L.M. 1186 ("Unity Treaty") superseded and vitiated 50 App. U.S.C. § 39(d), the Trading With the Enemy Act, "thereby reverting non-vested German property, including assets wrongfully held by the defendant."  (Compl. ¶¶ 98-99).  Plaintiff also sought an accounting and constructive trust based on claims of unjust enrichment and "tortious injury to personal property."  (Compl. ¶¶ 100-107).

On May 26, 2006, the Complaint was dismissed by this Court from the bench. UBS subsequently filed a motion for attorneys' fees pursuant to 28 U.S.C. § 1927 and this Court's inherent power to make such an award.  For the following reasons, that motion is granted.

## BACKGROUND

### I.    Overview

The arguments made in the 27-page Complaint can be encapsulated in a few

---

[2]  Interhandel is identified in the Complaint by a variety of other names: Gesellschaft fur Chemische Unternehmungen a/k/a I.G Chemie; Internationale Industrie und Handelsbeteilgungen AG a/k/a Société Internationale pour Participations Industrielles et Commerciales S.A.  This Memorandum & Order refers to it exclusively as "Interhandel."

paragraphs. In essence, Plaintiff seeks yet another determination of whether or not the GAF assets, admittedly lawfully seized by the Government pursuant to section 39 of TWEA, should now be returned to the successors in interest to I.G. Farben, a company that indisputably played an essential role in the Nazi war effort of World War II. Plaintiff bases its claim upon a presumed factual predicate that has already been litigated in the highest Courts of both Germany and the United States, and which was settled by the U.S. Government. That factual predicate is that a Swiss Company, Interhandel, the nominal owner of the GAF Assets, was held in secret trust for the benefit of I.G. Farben– a trust that by Plaintiff's contention was established by Farben at the behest of the Nazi government precisely for the purposes of evading seizure by the Allied powers in World War II.

Plaintiff's argument is also based upon a legal argument heretofore unraised: that the Unity Treaty which dealt primarily with the Unification of formerly divided Germany somehow revived Farben's interest in property seized and vested in the U.S. Alien Custodian in the 1940s pursuant to TWEA, and that the proceeds of the GAF Assets given to defendant UBS by virtue of the Government's settlement with them may, because of the Unity Treaty, now be returned to the successors of the Nazi collaborators from whom they were justifiably taken.

In sum, Plaintiff asks the Court to enforce an alleged trust made for the purpose of defrauding the Government. That argument is duplicative and frivolous on its face, and merits an award of attorneys' fees to UBS.

## II.    Background of Litigation

With the exception of the question of a secret trust relationship involving the

GAF Assets, little else is in factual dispute. Title 50 App. U.S.C. § 1 et seq. grants the executive branch extraordinary powers during wartime to seize enemy and enemy ally assets. In 1942, the U.S. Treasury Department ("Treasury") determined that GAF was an asset of Farben, a company that by Plaintiff's own admission played a significant role in facilitating Nazi Germany's aggression in World War II, including the production of explosives and synthetic gasoline. (Compl. ¶¶ 57-60).[3] Via several executive orders issued between 1942 and 1946 and pursuant to Congressional authority provided by TWEA as then in force, the Treasury authorized the seizure of a portion of GAF Assets. (¶ 58). See also Declaration of Thomas Teige Carroll "Carroll Decl." Exs. A, B & C). Those seizures resulted in the vesting of those assets in the U.S. Government. For example, a February 17, 1942 vesting order provided that certain GAF shares were "to be held, used, administered, liquidated, sold or otherwise dealt with in the interest of and for the benefit of the United States." (Vesting Order No. 1, 4 Fed. Reg. 1046 (Feb. 17, 1942)," Carroll Decl. Ex. A). At the time, GAF was a subsidiary of the Swiss company Interhandel, a predecessor of Defendant. (Compl. ¶ 2).

In 1948, Congress amended TWEA, codified at 50 App. U.S.C. § 39, barring the return of vested assets to enemies or their successors in interest. This section provides, in relevant part:

> No property or interest therein of Germany, Japan, or any national of either such country vested in or transferred to any officer or agency of the Government at any time after December 17, 1941, pursuant to the provisions of this Act...., shall be returned to former owners thereof or their successor in interest, and the United States shall not pay

---

[3] Farben was the single largest German war profiteer, and collaborated with the Hitler regime in plundering Austria, Czechoslovakia, Poland, Norway, Holland, Belgium, France and other countries conquered by the Nazis. (Compl. ¶¶ 60-62).

compensation for any such property or interest therein.
50 App. U.S.C. § 39(a).

The exclusive remedy for such seizure was suit under section 50 App. U.S.C. § 9(a).  50 App. U.S.C. § 39.  In La Due & Co. v. Rogers, the Seventh Circuit noted that, "in an action brought under section 9(a) of the Trading with the Enemy Act, the plaintiff bears the burden of proof in establishing the right, title and interest sought to be recovered in the vested property."  259 F.2d 905, 908 (7th Cir. 1958), cert. denied, 79 S.Ct. 588, 359 U.S. 911, 3 L.Ed.2d 575.  Plaintiff concedes that it was and is barred from reacquiring the GAF assets from the Government.  (Transcript of Oral Argument at 10:5-25, Farben Shareholders Organization v. UBS AG, (2006) (No. 05-4041) (hereinafter "May 26 Trans.")).

Soon after seizure, Interhandel, nominally a Swiss company, sued the American Government, seeking return of the GAF Assets.  See Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. McGranery, 111 F.Supp. 435, 437 (D.D.C. 1953).  "Interhandel, supported by the Swiss government, took the position that I.G. Chemie [a/k/a Interhandel] had severed its relationship with I.G. Farben in 1940 and was not a German-owned company at the time of the U.S. government seizure, and therefore, the seizure of its American I.G. assets in 1941 was unlawful."[4]  (¶ 6).  As a consequence, Interhandel contended, they were not "enemies" or "enemy allies" subject to TWEA.  (¶ 59).

The litigation over the GAF Assets continued for the next sixteen years. Meanwhile, "Farben itself was seized by the Allies and destined for liquidation."

---

[4] There are some discrepancies in the exact dates of the government seizure as stated in the papers, but they do not affect the determination here.

(Compl. ¶ 7).  On January 21, 1955, the I.G. Farben Liquidation Act eliminated I.G. Farben and created I.G. Farbenindustrie i.A. ("Farben-in-Liquidation"), for the purpose of winding-up Farben's business obligations.  (¶ 66).  In 1958, Farben-in-Liquidation attempted to intervene in the ongoing legal dispute between Interhandel and the Government, claiming that it had a beneficial interest in the assets.  (¶ 8).  Its application was summarily denied by the district court.  (¶ 9).  Order, Société Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers, No. 4360-48, at 1 (Dec. 19, 1958) (Carroll Decl. Ex. F).

Litigation between the Government and Interhandel continued.  The Government asserted that the Interhandel and therefore the GAF assets were actually owned by I.G. Farben and therefore had been properly seized.  The Government also sought corroborating discovery from Interhandel, which, despite several court orders, refused to produce the relevant information.  (Compl. ¶¶ 66-75). The district court dismissed the case with prejudice for failure to comply with the discovery order and the appellate court affirmed.  See Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Brownell, 243 F.2d 254 (D.C. Cir. 1957).  The case went to the Supreme Court, which in 1958 reversed lower court determinations and held that the failure of Interhandel to fully comply with a pretrial production order was not due to its own conduct, but rather because production of those documents might violate Swiss laws, and therefore the district court's dismissal with prejudice was unwarranted.  See Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197, 78 S.Ct. 1087 (1958).  The case was therefore remanded for further proceedings.

The litigation continued into the early 1960s when, between 1962 and 1964, Interhandel and the Government negotiated and consummated a settlement whereby GAF was auctioned to the highest bidder. The proceeds of the sale were divided between the Government and Interhandel, which received roughly 40% of that amount. That negotiation was conducted by and at the highest levels of the United States Government, with Attorney General Robert Kennedy being directly involved. (¶ 82). President Kennedy reflected upon the settlement in light of the prospect of ten more years of litigation and adjudged it to be the "best solution" available. (John F. Kennedy, Public Papers of the Presidents of the United States, in <u>Carroll Decl.</u>, Ex. G). The value of that distribution is estimated to have been $122,000,000. (¶¶ 9, 84).

Although it was denied intervention in the final settlement of claims to the GAF Assets, Farben, through various actual or purported successors to its legal claims, has pursued those interests in this Court and at least two others. In 1983 Farben-in-Liquidation, a successor to I.G. Farben, brought suit against UBS in Germany, essentially asserting the secret trust theory proposed here. (¶¶ 10, 86). In 1988, the Higher Regional Court in Frankfurt decided against Farben on the merits of the trust claim, holding that "there is no legally valid fiduciary agreement between the parties, in addition to which any such agreement that were to exist would be subject to Swiss law and would be statute-barred..." <u>Makro Capital of America, Inc. v. UBS AG</u>, 372 F.Supp.2d 623, 625 (S.D.Fla. 2005) (citing <u>I.G. Farbenindustrie AG in Abwicklung v. Schweizerische Bankgesellschaft</u>, No. 9 U 80/84, slip op. at 7 (Higher Reg'l Ct. Frankfurt Mar. 23, 1988)). The Federal Supreme Court of Germany denied certiorari. <u>I.G. Farbenindustrie AG in Abwicklung v. Schweizerische Bankgesellschaft</u>, No. XI ZR

84/88 (Fed. S.Ct. Germany Dec. 20, 1988).

In 2004, a suit nearly identical in its factual allegations but distinct in its legal claims was brought by several plaintiffs purporting to have succeeded to Farben's alleged interests. <u>Arndt v. UBS AG</u>, 342 F.Supp.2d 132 (E.D.N.Y. 2004) (Glasser J.). The <u>Arndt</u> action was brought by two purported Farben shareholders--Andreas Arndt ("Arndt"), an individual, Magus Verwaltungs ("Magus"), a business entity owned by Mr. Arndt, and also on behalf of unnamed shareholders of Farben. <u>Id.</u> at 134. Ludwig Koch, the present Trustee of the FSO, was not appointed trustee for the Farben shareholders until June 25, 2004, after the onset of litigation. (Declaration of Gary M. Osen in Opposition to Defendant UBS AG's Motion for 28 U.S.C. 1927 Sanctions, "<u>Osen Decl.</u>," Ex. F). Prior to Defendant's filing of an answer or motion for summary judgment, Ludwig Koch, as trustee of FSO and on its behalf, stipulated to a voluntary dismissal without prejudice pursuant to Fed.R.Civ.P. Rule 41(a)(1)(i). The FSO asserted that they sought to withdraw because they did not believe that either Arndt or Magus had the authority to bring the claims, and they did not want to have their rights in "any way prejudiced" by that determination.[5] (Transcript of Oral Argument at 10:16-24, <u>Arndt v. UBS AG</u>, 342 F.Supp.2d 132 (E.D.N.Y. 2004) (No. 05-4041) (hereinafter "Jul. 30 Trans.")). This Court specifically noted on two occasions during the colloquy that, based upon UBS's motion to dismiss, it was irrelevant who was representing the interests of I.G. Farben, since regardless of the plaintiff, there were several obstacles to bringing claims on behalf of Farben's former interests. (<u>See</u> Jul. 30 Trans., 29:9-21, 32:1-5).

---

[5] During oral argument, Mr. Edward Fagan, attorney for the <u>Arndt</u> plaintiffs, seemingly conceded that his client could no longer bring these claims. (Jul. 30 Trans., 22:6-24).

Specifically, this Court stated:

> I don't know it behooves this Court to make some determination as to who
> or who is not the duly appointed trustee in view of Mr. Fagan's position.  I
> think it may be irrelevant as far as the ultimate disposition of this lawsuit
> is concerned. (Jul. 30 Trans., 31:25-32:4).

The Court then determined that the claims asserted by Arndt and Magus had to

be dismissed for lack of subject matter jurisdiction, since there was no federal question

jurisdiction under the only two asserted bases–the Alien Tort Claims Act ("ATCA") or

the Torture Victims Protection Act ("TVPA").  The claims asserted did not give rise to

claims under "customary international law" and were made against a corporation, not a

defendant who had acted under the color of state law.  Id. at 140-41.  In analyzing the

ATCA claim, the Court noted the facial inconsistency of Plaintiff's argument.  If

Interhandel and GAF were in fact assets of Farben, a forfeiture of those assets to the

U.S. Government would have been proper, and neither Farben nor its successors in

interest could have a legitimate claim to them.  This Court in Arndt noted:

> Indeed, as Defendant notes in its memorandum, if Plaintiffs are correct
> that UBS's predecessor was controlled by Farben after 1940, including
> during World War II–the issue litigated in the United States for sixteen
> years beginning in 1948–the Interhandel Assets which Plaintiffs claim
> should be rightfully returned to them for distribution to Holocaust
> survivors, would be the property of the United States, which had seized
> them initially for just that reason.  Arndt, 342 F.Supp.2d at 139 n.6.

This Court also noted that if it had found that it could properly exercise

jurisdiction over the Arndt case, it would have dismissed based upon principles of

comity and the political question doctrine.  It stated, in relevant part:

> [I]n 1988, the Frankfurt Court of Appeals rejected the very same claims
> that Farben asserts in this case that it litigated in Germany.  The German
> Supreme Court denied Farben's petition for certiorari from the judgment
> of the Frankfurt Court of Appeals.  Under well established Second Circuit

case law, "American courts will normally accord considerable deference to foreign adjudications as a matter of comity." See, e.g., Diorinou v. Mezitis, 237 F.3d 133, 142 (2d Cir. 2001).

Further, since the executive branch of the United States government, including the Attorney General and President, were involved in, and approved, the settlement of the same claims which plaintiffs advance here, see Schmitz v. Societe Internationale Pour Participations Industrielles et Commericales, S.A., 249 F.Supp. 757, 759 (D.D.C. 1966), cert. denied, 387 U.S. 908, 87 S.Ct. 1684, 18 L.Ed.2d 626 (1967), the political question doctrine would also preclude Plaintiffs' claims and warrant dismissal of the Amended Complaint. See, e.g., Greenberg v. Bush, 150 F.Supp.2d 447, 454 n. 4 (E.D.N.Y. 2001) ("It is wholly inappropriate for the judicial branch to question 'a political decisions already made'") (citing and quoting Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). Arndt, 342 F.Supp.2d at 141 n. 7.

In sum, this Court specifically noted that these discretionary doctrines would apply to claims brought on the same factual predicates asserted here.

Also in Arndt, Defendant UBS moved to enjoin the prosecution of another action based on the same series of transactions litigated here. See Makro Capital of America, Inc v. UBS AG, 372 F.Supp.2d 623 (S.D.Fla. 2005). Makro was a Florida Corporation and an alleged shareholder of Farben, proceeding under the court's diversity jurisdiction and alleging five causes of action for accounting, imposition of constructive trust, fraud, misrepresentation, and spoliation of evidence. Id. Because this Court did not have subject matter jurisdiction over the Arndt action, the Makro proceeding could not be enjoined. Id. at 142.

However, the Florida court dismissed those claims, holding that the return of GAF Assets to Farben was barred by Section 39(a) of the Trading with the Enemy Act ("TWEA"). Since Makro, as legal successor to Farben's interest, only had as great a right as Farben did, no remedy was available to it. See 50 App. U.S.C.A. § 39(a).

Finally, on August 23, 2005, Plaintiff filed this action. Oral argument was heard on May 26, 2006 and the Court dismissed the case from the bench. This Court found three independent considerations compelling dismissal:

(1) Section 39(a) of TWEA acted as a permanent bar to the relief requested, since the assets in question had been "permanently confiscated by the United States at the end of World War II, and there was no possibility of returning those assets to the original German owners…" (Transcript of Oral Argument at 27:6-11, Farben Shareholders Organization v. UBS AG, (2006) (No. 05-4041) (hereinafter "May 26 Trans.")). This Court found the Plaintiff's arguments with respect to the Unity Treaty totally without merit, since that treaty doesn't contain a line of text dealing with reparations or the return of assets. (May 26 Trans., 30:8-25). Furthermore, there was no positive repugnancy in that treaty with respect to Section 39, and so there was no basis for contending that the Unity Treaty in any way altered or repealed TWEA, since repeals by implication are disfavored. Cf. Blanco v. United States, 775 F.2d 53, 61 (2d Cir. 1985). (2) The political question doctrine also precluded relief, since "neither this court nor any other court can undertake to properly second guess the United States foreign policy regarding the seizure of assets pursuant to the Trading with the Enemy Act." (May 26 Trans., 31:13-16).

(3) Finally, the Court found that the case clearly invoked principles of international comity (May 26 Trans., 32:6-10), since, as Plaintiff's counsel properly conceded, the factual issues confronting the German courts were precisely the same as those in this case, despite the fact that the claims asserted were "materially different." (May 26 Trans., 18:3-10).

Against this backdrop the Court considers defendant UBS's request for attorneys' fees.

**DISCUSSION**

**I.  Standards for Awarding Attorneys' Fees**

UBS seeks attorneys' fees under either of two alternative legal grounds.  First, they seek an award of those fees based upon 28 U.S.C. § 1927, which states in relevant part that:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

UBS alternatively requests the court to award sanctions under its inherent power so to do.  This power "permits the court to award a reasonable attorneys' fee to the prevailing party when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  Oliveri v. Thompson, 803 F.2d 1265, 1272 (2d Cir. 1986).  "Bad faith may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation."  Id.  Moreover, bad faith may be inferred from an attorney's actions when they are "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay."  Schlaifer Nance & Co. Inc.  v. Estate of Warhol, 194 F.3d 323, 336 (2d Cir. 1999).  The Court focuses on the standards for employing a court's inherent power to sanction, since that is the grounds upon which the determination is made.

The standard has been interpreted restrictively.  The Circuit has declined to permit an award of attorneys' fees absent both "clear evidence that the challenged

actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes, and a high degree of specificity in the factual findings of the lower courts." Id. (internal citations omitted) (citing Dow Chemical Pacific Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 344 (2d Cir. 1986). In Dow Chemical, the Circuit defined a claim as "colorable" for purposes of the bad-faith exception when "a reasonable attorney could have concluded that facts supporting the claim might be established, not whether such facts actually had been established." Id. at 344.

An award of attorneys' fees it must be supported by a finding of bad faith. Oliveri, 803 F.2d at 1273. See also Hudson Motors Partnership v. Crest Leasing Enterprises, 845 F.Supp. 969, 982 (E.D.N.Y. 1994). But see, United States v. Seltzer, 227 F.3d 36 (2d Cir. 2000) (holding that when a district court invokes its inherent power to sanction a party for actions taken by an attorney in representing the client, the Court must find bad faith, but when that power is invoked to sanction misconduct not undertaken for the client's benefit and in violation of a court order, bad faith need not be found before imposing the sanction). Unlike an award made under § 1927 which may only be made against "attorneys or other persons authorized to practice before the courts," one made pursuant to the court's inherent power "may be made against an attorney, a party, or both." Oliveri, 803 F.2d at 1273. When evaluating bad faith, the appropriate focus "is the conduct of the party in instigating or maintaining the litigation, for an assessment of whether there has been substantive bad faith as exhibited by, for example, its pursuit of frivolous contentions, or procedural bad faith as exhibited by, for example, its use of oppressive tactics or its willful violations of court orders." Dow Chemical, 782 F.2d at 345.

## II.   Application

### A.   Was the Claim "Colorable?"

The first question before the Court is whether plaintiff (and counsel) harbored a reasonable belief that the facts supporting their claims could have been established.  The claims, however, are preposterous on their face.  It is clear that Plaintiff's claim is derived from whatever interest Farben-in-Liquidation had, which in turn was derived from I.G. Farben itself.  (Compl. ¶¶ 8-17).  The fact was made abundantly clear during oral argument when Plaintiff's counsel confirmed to the Court that the suit was designed to have assets returned to I.G. Farben, tempered by the caveat that they were not seeking return of the assets "by the United States, and not by [a] bona fide purchaser of vested assets of the United States."  (May 26 Trans., 10:21-25).

It makes no difference that Plaintiff here, FSO, is not in fact I.G. Farben, since as assignee of Farben's rights, it can have no greater right in these assets than Farben itself would have had.  Kolbeck v.  Lit America Inc., 923 F.Supp. 557, 566 (S.D.N.Y. 1996) aff'd 152 F.3d 918 (2d Cir. 1998) (citing Active Fire Sprinkler Corp. v. United States Postal Serv., 811 F.2d 747, 755 (2d Cir.1987); Trans-United Indus., Inc. v. Cohn, 351 F.2d 605, 606 (2d Cir. 1965); United States v. Foster Wheeler Corp., 639 F.Supp. 1266, 1269 (S.D.N.Y. 1986)).

Plaintiff acknowledges that the Government "had the absolute right to seize the assets of GAF pursuant to the Trading With the Enemy Act."  (Compl. ¶ 58).  In discussing the legal significance of vesting authorized by the TWEA in the context of World War I reparations payments, the Supreme Court has stated:

Alien enemy owners were divested of every right in respect of the money

and property seized and held by the Custodian under the Trading with the Enemy Act....The title acquired by the United States was absolute and unaffected by definition of duties or limitations upon the power of the Custodian or the Treasurer of the United States. Congress reserved to itself freedom at any time to dispose of the property as deemed expedient and right under circumstances that might arise during and after the war...As the taking left in enemy owners no beneficial right to, or interest in, the property, the United States did not take or hold as trustee for their benefit. Cummings v. Deutsche Bank Und Disconto-Gesellschaft, 300 U.S. 115, 120-21, 57 S.Ct. 359 (1937) (citations omitted).

That seizure was a valid exercise of the Government's authority under the Act even if it was subsequently proven erroneous. Becker Steel Co. of America v. Cummings, 296 U.S. 74, 79 56 S.Ct. 15, 80 L.Ed. 54 (1935). Importantly, a party seeking the return of seized assets would have had to sue the Government and prove ownership--the exclusive remedy for an erroneous seizure of property was provided for by section 9(a) of the Act. See La Due & Co. v. Rogers, 259 F.2d 905, 908 (7th Cir. 1958), cert. denied, 79 S.Ct. 588, 359 U.S. 911, 3 L.Ed.2d 575. Plaintiff concedes that the Government properly seized the GAF Assets and was under no obligation to return them to former nationals of Germany, and that it is barred from reacquiring the GAF assets from the Government. (May 26 Trans., 9:10-17, 10:5-25). In sum Plaintiff concedes that the vesting of the GAF Assets vested in the Alien Custodian severed any claim that I.G. Farben, or its successors in interest, might have had. FSO's rights were extinguished by the seizure of these assets over sixty years ago.

Plaintiff attempts to bridge this gaping hole in its argument by contending that the question is whether it, as I.G. Farben's successor in interest, has a greater right to

the assets than UBS, the successor in interest to Interhandel.[6]  It contends that TWEA does not "shield" non-bona fide purchasers of these assets, even though it would shield the Government from any claims it may make.  It predicates its claim upon a supposed secret trust by which Interhandel held the GAF Assets in trust for Farben in order to evade the Government's seizure of them.[7]  To state the theory is to reveal its obvious flaw—under this theory, Plaintiff purports to represent Farben's rights to those assets, a right that was decisively severed when the assets were vested in the Alien Custodian of the Government.

Plaintiff's other attempts at distancing itself from Farben fair no better.  Plaintiff argues that since "FSO does not qualify as a former owner or successor [of Farben] under TWEA," it is not barred by TWEA.  (Plt. Mem. 24).  This argument rings hollow; FSO brings suit as assignee of Farben's now extinguished right to the GAF Assets, and therefore stands in its shoes.  Whether for other purposes the FSO is not a proper successor to Farben is irrelevant, it is that purported right which forms the basis for this claim.

Quite simply, a claim asserted by a successor with no greater right than the predecessor, whose own claim would clearly be invalid, is not "colorable."  Plaintiff provides no legal basis for the contention that any subsequent defrauding of the Government with respect to the GAF Assets should ever inure to their benefit, since

---

[6]  Plaintiff states that, "consequently, the real issue before this Court is not whether Plaintiff's claim is superior to that of the United States' claim; the issue is whether Plaintiff's claim is superior to that of UBS's claim."  (Plt. Mem. 24).

[7]  It is precisely this theory that the Government asserted in opposition to Interhandel's claim to the assets, showing that the Government was both aware of the claims now asserted by FSO when by stipulation it split the proceeds from the sale of the GAF Assets with Interhandel, and that the claims raised by FSO are, in essence, surplus of arguments made over fifty years ago.

their rights were severed by the vesting, and they in fact concede that the vesting was not only lawful, but would have been justified by the trust theory they propose here.

The baselessness of the claims is made more apparent by the <u>Makro</u> litigation. That court decided precisely the same issue–although the named plaintiffs were not the same, they derived their rights and purported standing to sue from precisely the same source as FSO. There, the court examined a parallel aspect of this line of reasoning–the impossibility of returning assets to plaintiffs suing on behalf of I.G. Farben. It was apparent that section 39 of TWEA would bar such a remedy. As the <u>Makro</u> court noted:

> Even if everything Makro alleges is true, the result it seeks–return of the GAF sale proceeds to Farben–is not a legally obtainable remedy.... Accordingly, neither Farben, a national of Germany, nor its alleged successor in interest, Makro, may recover the proceeds from the sale of the GAF shares, the ownership of which was vested in the United States pursuant to the Trading with the Enemy Act in 1942 and 1943.

<u>Makro</u>, 372 F.Supp.2d at 627.

FSO nevertheless contends that the Unity Treaty somehow revived a right to the GAF Assets that had previously been barred by TWEA. However, Plaintiff admits that "[t]he Unity Treaty did not require these governments to return previously vested assets." (Plt. Mem. 25). This concession decisively concludes the inquiry. Nevertheless, an examination of the Unity Treaty makes clear that there is no explicit repeal of section 39 of TWEA, nor is there any reasonable means of implying such exclusion from the text or diplomatic notes related thereto.

Plaintiff asserts that Article 7 of the Unity Treaty supports their contention. Article 7 states in relevant part that:

> The French Republic, the Union of Soviet Socialist Republics, the United Kingdom of Great Britain and Northern Ireland and the United States of America hereby terminate their rights and responsibilities relating to Berlin and to

> Germany as a whole.  As a result, the corresponding, related quadripartite agreements, decisions and practices are terminated and all related Four Power institutions are dissolved.

29 I.L.M. 1186, 1191.

The text makes no reference whatsoever to past payments or spoils of war, much less assets that have already been vested in the Government.  Even assuming Article 7 could be read to mean that continued reparations payments and future claims by state signatories were prohibited, it would not resuscitate the purported right upon which Plaintiff's claim is based.[8]  Moreover, it is well established in this context that repeals by implication are disfavored.  See Blanco v. United States, 775 F.2d 53, 61 (2d Cir. 1985) (Friendly, J.).

FSO further asserts that the Unity Treaty prevents the Government from today pursuing assets owned by former enemies, and that therefore if it were somehow today determined that Interhandel was indeed an enemy ally, the Government could not lawfully pursue those assets.  (May 26 Trans., 11:5-17).  FSO further contends that since Interhandel defrauded the Government in its negotiations, and since the Government could no longer pursue those claims, FSO should be declared the rightful heir to the possession of the GAF Assets.

FSO claims that this position is bolstered by an analysis of the Unity Treaty in Iwanowa v. Ford Motor Co., 67 F.Supp.2d 424 (D.N.J. 1999).  Plaintiff asserts that its claims here are colorable since that court held that Article 7 of the Unity Treaty provides

---

[8]  Plaintiff submits a Declaration of Kay Hailbronner, a German legal scholar, in support of its position.  (Declaration of Professor Kay Haibronner in Support of Plaintiff's Opposition to UBS's Motion to Dismiss, "Hailbronner Decl.").  Professor Hailbronner, however, does not assert that the Unity Treaty returned legal claims such as Farben's to parties whose rights were previously extinguished by either treaties or statutes of the victorious Allies.  Even accepting Professor Hailbronner's legal interpretation of the significance of the statute, it is clear that neither Farben nor FSO would have a claim to assets seized nearly 60 years ago by the Federal Government.

that "Allied nations can demand no further reparations payments from Germany." Id. at 454. In Iwanowa, the class action plaintiff sought damages for labor that she, along with thousands of others, was forced to perform without compensation by a German subsidiary of Ford Motors, Inc. Id. at 431-32. Iwanowa is irrelevant to the issue here, and cannot give ground to Plaintiff's arguments, since it does not comment on whether those treaties resurrected Farben's severed rights to the GAF Assets, and no language in the treaty indicates otherwise. The seizure and vesting of those assets severed that right, and § 39(a) of TWEA bars their return.

### B.     May a finding of bad faith be made?

Plaintiff attempts to shield itself from sanctions by contending that the Arndt and Makro litigation cannot be imputed to FSO or to its counsel. (Plt. Mem. 1-2). Describing the history of those claims, Plaintiff contends that on May 5, 2003, two non-parties to this litigation, Mr. Beutenmuller and Mr. Petrowsky were appointed trustees of FSO by a court in Cologne, Germany, after which they assigned a 95% interest in the FSO's inherited claims to Magus Verwaltungs GmbH and Andreas Arndt, the plaintiffs in Arndt. (Osen Decl. ¶ 26, n. 1). Subsequently but prior to substantive orders being made by the district courts in the Arndt and Makro litigations, on January 9, 2004, the Cologne court enjoined Mr. Beutenmuller and Mr. Petrowsky from filing any lawsuits or continuing any litigation on behalf of the FSO. (Osen Decl. ¶ 14). Those parties nevertheless, through their attorney, Edward Fagan, signed a complaint on February 4, 2004, initiating the Arndt litigation. Plaintiff's counsel also avers that, unbeknownst to him, Mr. Beutenmuller and Mr. Petrowsky filed another action through their counsel, Mr. Fagan, in the Southern District of Florida under the incorporated name of "Makro

Capital Corporation." See Makro, supra. (Osen Decl. 27). Prior to a decision in either case, the Cologne court discharged Mr. Beutenmuller and Mr. Petrowsky as trustees on March 8, 2004. (Osen Decl. ¶ 15). On June 25, 2004, Dr. Ludwig Koch was then appointed as trustee of the FSO. (Osen Decl. ¶¶ 19, 20). Dr. Koch then hired the current counsel and sought withdrawal of the FSO from the Arndt action, only to later file the present action along with two qui tam actions pending on this Court's docket. Plaintiff describes this lengthy history in order to make one of essentially two arguments in its defense: that this litigation cannot count as an unnecessary multiplication of the filings in those actions, since Plaintiff had nothing to do with them.[9]

Plaintiff's counsel and Dr. Koch, the present FSO trustee were plainly aware of the history of this litigation when this suit was filed. That awareness, as well as the manner in which the present claims have been litigated, support an award of attorneys' fees, notwithstanding the fact that neither this Plaintiff nor its counsel were progenitors of the Arndt and Makro suits. That FSO, through a succession of appointed trustees and successors claiming independence from each other, seeks to recapture assets once owned by a company allied with the Nazi Reich which were subsequently seized and distributed to a Swiss company, Interhandel, on the theory that Interhandel was secretly created for the purpose of concealing Farben's ownership of those assets from the Government, defies the imagination. It is beyond doubt that the very purpose of the legislation regarding the Government's power to seize these assets in the first place was

---

[9] The other argument asserted by Plaintiff is that the Makro litigation did not consider "(1) whether TWEA could be applied to assets not held by the United States, or (2) the legal significance of the Unity Treaty of 1990 in assessing the continued applicability of 39 of TWEA." (Plt. Mem. 7). Those arguments were addressed by the discussion supra.

to prevent such sleight of hand from being effectuated.  Defining the seizure powers under the War Powers Act of 1941, the same provisions under which the Alien Custodian was authorized to seize the property at issue here, the Seventh Circuit court noted that, "the power of seizure and vesting was extended to all property of any foreign country or national so that no innocent appearing device could become a Trojan horse."  Kaku Nagano v. McGrath, 187 F2d 759, 764 (7th Cir. 1951).  Admittedly unable to make a colorable claim against the Government for a return of those assets, FSO now attempts to sue another party which made a claim as to them and with whom the Government settled.

The Arndt and Makro litigation aside, the present litigation is vexatious since it seeks without a reasonable basis to resuscitate a claim that was decisively settled years ago.  The sixteen-year litigation saga that culminated in the 1964 auction of GAF Assets dealt precisely with this ownership question.  The Government defended against those claims for many years, asserting that Interhandel was in fact owned and/or controlled by Farben or was the property of foreign nationals and therefore properly seized. ("Defendants' Memorandum in Opposition to Motion of Ferdinand Kremer and Walter Schmidt, et al., for Leave to Intervene," Societe Internationale Pour Participations Industrielles et Commerciales, S.A., v. Rogers, 357 U.S. 197 (1958) (No. 348) Carroll Decl., Ex. E).  When two liquidators suing on behalf of I.G. Farben and Farben-in-liquidation sought to intervene, the Government contended that those parties as enemies held no claim to the assets, and further asserted that although Farben's claims implied the falsity of Interhandel's claims, Farben had to that date refused the Government's requests to assist in its defense by offering corroborating evidence.  (Id.).

The Government's position there makes clear that it in no way relied upon the representations made by Interhandel–it was seeking documents in an attempt to prove the contrary. Moreover, Farben's right to those assets was implicitly rejected by the district court's summary denial of Farben's motion to intervene to protect those interests.

The Government had an absolute right to settle and dispose of the claims made against it by Interhandel and it exercised that right. The question involved political choices regarding the destruction of the Nazi regime and the rebuilding of Germany. Like most settlements, it was not a precise determination of the rights and liabilities of the parties, but a final resolution of a contentious dispute that, in this case, had gone on for sixteen years. Unlike most settlements, it dealt with the remains of a regime that had initiated the largest, most horrific war in human history. The settlement of those claims involved the highest levels of the executive branch. It included a release of any claim that might be espoused by the Swiss government on behalf of itself, its political subdivisions, or any Swiss national person. (See "Stipulation of Settlement," Carroll Decl., Ex. D). The history relevant to this case as well as Plaintiff's purported legal basis for bringing the claim–the last in a series of treaties dealing with wartime reparations–belies its claim that the present case focuses "only on Plaintiff's property rights and not on the power, authority or rectitude of any decision rendered by the Executive Branch." Quite clearly, it invokes the Executive Orders from the 1940s which urged that the property be seized and vested in the U.S. Government. The entirety of Title 50 App. U.S.C. § 1 et seq., from which the authority to seize those assets is derived, is committed to the executive's discretion, making it a clear case in which the political

question doctrine should be invoked.  *See* Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230, 106 S.Ct. 2860 (1986) ("The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.").

In the suit brought in Germany, it was determined that no action based upon a secret trust—the same trust asserted here—could lie.  (See IG Farbenindustrie A.G. vs. Schweizerische Bankgesellschaft, Frankfurt am Main Oberlandesgericht (Higher Regional Court) decision dated Mar. 23, 1988, Carroll Decl., Ex. H).  Plaintiff admits that the German Court considered precisely the same factual predicate supporting this claim.  Such re-litigation is clearly frivolous and vexatious.  Moreover, it also supports a determination by this Court to abstain from reconsideration based upon principles of international comity.[10]  Diorinou, 237 F.3d at 142.

---

[10] The relevant portion of the Court's colloquy on the question of international comity with respect to the German court's decision stated, in relevant part:

> THE COURT: Were the issues in that suit precisely the same as the issues in this suit?
> MR. OSEN: I would say that they were.  The characterization by Mr. Weidner is largely correct, to the extent it was an I.G. Farben lawsuit against Interhandler's [sic] successor at the time, so it was a claim for the recovery of the same assets, and in that sense it was the same action.  In terms of, however, the claims and issues involved were materially different.

(May 26 Trans., 18:2-10).  Plaintiff attempted to distinguish the cases with the argument that the German court, like all courts previous to this action, were defrauded by misrepresentations made about a Swiss Government report, the "Rees Report," that Plaintiff contends shows that Interhandel held the GAF assets in trust for Farben.  That court found the plaintiff's claims meritless anyway.  The German court stated:

> Nor was it necessary for the purposes of these proceedings to attempt to obtain a copy of the "Rees report."  However, the reasons given by the Swiss Federal Council ("Bundesrat") for its refusal to allow the Plaintiff to inspect these files appear to support the assumption that the conclusions reached in that report are not those that are contained in the audit report of the Swiss Clearing Agency which was published later.  This may be due to a number of reasons on which one can only speculate.  Nevertheless, the Rees report is definitely not of relevance to the issue of whether a fiduciary agreement was tacitly concluded and remained in effect beyond 1940: as set out above, this would not be possible for legal reasons and, moreover, any claims that might exist under such fiduciary agreement would be statute-barred.

Additionally, the <u>Arndt</u> and <u>Makro</u> actions brought by other successors to Farben's purported interests were dismissed for reasons obviously applicable here. <u>See</u> <u>Arndt</u> and <u>Makro</u>, <u>supra</u>. Although Plaintiff was not a party to either of those decisions, it was no doubt aware of those holdings and should have recognized the implications for their claims. Plaintiff contends its only relationship with those plaintiffs is "adverse." It is more appropriate to describe the relationship as one of several heirs to defunct claims of Farben's former assets competing for those proceeds through vexatious and harassing litigation against UBS.

Aware of those proceedings, Plaintiff brought this claim based upon the same facts, dressing the argument with the frivolous claim that the Unity Treaty somehow improved FSO's chances of recovery. Although FSO asserts that the Unity Treaty prevents the United States from asserting any new claim or reviving an old one against Germany, it has nonetheless filed two actions against UBS as qui tam relators purporting to act on behalf of the Government.[11] Under circumstances such as these, the Court does not hesitate to exercise its inherent power to condemn this claim as a vexatious lawsuit brought in bad faith.

## CONCLUSION

Since it is, in large part, the history of the litigation that forms the backdrop justifying sanction, the Court imposes the sanction upon Plaintiff. However, since

---

(<u>Carroll Decl.</u>, Ex. H) (emphasis added).

[11] Plaintiff asserts in a footnote unsupported by legal authority that those claims are not barred by the Unity Treaty, a position it takes here, even though reparations claims would be because they are based on fraud. Those related matters are pending on this Court's docket. <u>See</u>, <u>United States of America ex rel. Dr. Ludwig Koch v. UBS AG</u>, 05-cv-854 (ILG); <u>United States of America ex rel. Dr. Ludwig Koch v. UBS AG et. al.</u>, 05-cv-1618 (ILG).

Plaintiff's counsel played a role in that behavior by facilitating the suits, the Court finds that a sanction of Plaintiff's counsel is also warranted. Therefore, it is hereby ordered that UBS be awarded attorneys' fees for the reasonable costs of bringing the motion to dismiss in this case, payable jointly and severally by Plaintiff and Plaintiff's counsel. It is further ordered that the parties report to Magistrate Judge Gold to whom this matter is referred to report and recommend the amount of attorneys' fees to be awarded.

SO ORDERED.


Dated:       September 5th, 2006
             Brooklyn, New York



_____S/_____
I. Leo Glasser
United States District Judge


On this day, copies of the foregoing were sent electronically to:


Gary M. Osen &
Aaron Schlanger
Osen & Associate, LLC
700 Kindermack Road
Oradell, NJ 07649

Andrew David Friedman
Wechsler, Harwood, Halebian & Feffer, L.L.P.
488 Madison Avenue
8th Floor
New York, NY 10022

Attorneys for Plaintiff

James B. Weidner &
Thomas Teige Carroll
Clifford Chance LLP
31 West 52nd Street
New York, NY 10019-6131

Attorneys for Defendant